IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | Case No. 04-00407-11-CR-W-DW |
| CHARLES D. ZELK, ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Charles Zelk's Motion to Suppress Evidence of Search and Seizure. For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On December 15, 2004, the Grand Jury returned a fourteen count indictment against Patrick P. Gruetze, Terra Hedger, Winfred E. Taylor, Edward Bowman, Jr., Christopher Burton, James Deterding, Angela K. Baker, John A. Hughes, Joseph B. Miller, Kristy Hays, Charles D. Zelk, Patrick S. Allen, Kara S. Patrick and Jerry P. Vinson. Defendant Zelk is charged in Counts One and Eight of the indictment. Count One of the indictment charges that between April 1, 2003, to the present, all defendants knowingly conspired with each other and others to manufacture methamphetamine in an amount of fifty grams or more. Count Eight charges that on May 28, 2004, defendants Hays and Zelk knowingly attempted to manufacture methamphetamine.

On June 17, 2005, the undersigned conducted an evidentiary hearing on the motion to suppress. Defendant Zelk was represented by appointed counsel, Glenn Bradford. The Government was represented by Assistant United States Attorney Catherine Connelly. The Government called Officer Paul Thompson and Detective Bill Sweeney of the Independence, Missouri Police Department as witnesses. Defendant Zelk testified on behalf of the defense.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Officer Paul Thompson has been a police officer for twenty-one years. (Tr. at 3) He currently works as a K-9 handler and trainer. (Tr. at 3) He previously worked on a SWAT entry team. (Tr. at 4) On the entry team, Officer Thompson served hundreds of search warrants at locations with suspected methamphetamine labs. (Tr. at 4) Based on this experience, Officer Thompson is familiar with the components normally found at a meth lab. (Tr. at 4)

2. On May 28, 2004, Officer Thompson heard a dispatch come over the airway at approximately 12:22 p.m. (Tr. at 5; Government's Ex. 12) The information broadcast was concerning a possible burglary in progress where the reporting party saw a white male exit the back of a residence at 11014 East 23rd Street, carrying a plastic bag and a handgun. (Tr. at 5) The dispatch kept updating. (Tr. at 5) The reporting party stated that he thought someone else might be in there too. (Government's Ex. 12) Officer Thompson testified that, apparently, there was an angry caller who did not feel that the police were responding promptly enough and he threatened to get his own gun and go back over and take care of whatever it was he thought he needed to take care. (Tr. at 5)

3. Officer Thompson responded to the dispatch. (Tr. at 6) Officer Thompson testified that the police have a duty to respond to any and all calls, especially one of this nature where there is a possibility that someone is armed. (Tr. at 26) Officer Thompson's dog is trained as both a narcotics detector and a patrol dog. (Tr. at 6) Patrol dogs are used for area searching, building searching and handler protection. (Tr. at 6) Officer Thompson will normally respond on any hot call (i.e. a crime in progress, a party is armed or large fights) if he is not busy. (Tr. at 6) Officer Thompson considered the dispatch regarding the burglary in progress to be a hot call. (Tr. at 6)

4. Officer Thompson's supervisor, Sergeant Bullard, arrived at 11014 East 23rd Street, just seconds after Thompson's arrival. (Tr. at 6-7) Officer Luke Lewis also responded to the burglary call. (Tr. at 7) When Officer Thompson arrived, no one had entered the residence. (Tr. at 7) Officer Thompson proceeded to the backyard while Officer Lewis went to the front of the house. (Tr. at 7) Officer Thompson observed an open door that led into an area described by Thompson as a breezeway, a mud room or a porch. (Tr. at 7) Not knowing at that point whether there were any suspects or victims inside the house, Officer Thompson waited until he had another officer who was close before entering the breezeway. (Tr. at 7-8) Government's Exhibit 2 is a photograph of the breezeway entry. (Tr. at 8) Officer Thompson testified that while Government's Exhibit 2 shows a wooden screen door on the breezeway entry, he does not recall there being a door there at the time. (Tr. at 8) Government's Exhibits 3 and 4 are photographs that show a window one would see immediately upon entering the breezeway. (Tr. at 8) The window is closed in the photographs, but it was open at the time that Officer Thompson was investigating the burglary in progress call. (Tr. at 8-9)

5. After other officers arrived at the rear of the house, Officer Thompson went into the breezeway to investigate. (Tr. at 9-10) Officer Thompson walked through the open doorway and saw the open window. (Tr. at 10-11) The open window was significant to Officer Thompson because it added credence, based on his experience, that there had possibly been a burglary committed or that possibly someone was still inside the residence. (Tr. at 11) There were no other signs of breaking and entering. (Tr. at 14) However, Officer Thompson testified that he has been on burglary calls where there have been no signs of forced entry. (Tr. at 14)

6. Officer Thompson looked through the open window and saw a large Pyrex-type beaker in plain view on the kitchen table. (Tr. at 12) Officer Thompson testified that he has seen flasks, similar to the one he saw on the kitchen table, used in the manufacturing of methamphetamine. (Tr. at 12) While Officer Thompson took note of the flask, his concern at that time was not a meth lab. (Tr. at 12) Instead, Officer Thompson was concerned that a victim might be injured inside the residence or that a suspect might still be inside the residence. (Tr. at 12-13) Officer Thompson did not have his dog with him because the dogs are not trained to distinguish a victim from a suspect. (Tr. at 13) Officer Thompson does not routinely put a dog into a house to search for people because the dog might cause further injury to a victim. (Tr. at 13)

7. Next to the open window was a closed door that led into the house. (Tr. at 11, 13) Officer Thompson turned the doorknob and discovered that it was not locked. (Tr. at 13) He opened the door and announced that they were police officers to see if he could get a response from anyone inside. (Tr. at 13-15) There was no response. (Tr. at 14) Officer Thompson then walked through the door into the kitchen area where he also had a view of the living room area. (Tr. at 14-15) Officer Thompson observed syringes and other paraphernalia items on the living room floor in plain view. (Tr. at 15; Government's Ex. 8) Officer Thompson also observed some small one inch by one inch plastic baggies that are commonly used to carry narcotics on the living room floor in plain view. (Tr. at 15-16) From the living room, Officer Thompson walked through a bedroom that led into a bathroom and then another bedroom. (Tr. at 16) In one of the bedrooms, Officer Thompson observed a large cardboard box that was open. (Tr. at 16) The box contained items that are commonly used in manufacturing methamphetamine, such as pitchers, coffee filters, rubber latex gloves, tubing and funnels. (Tr. at 16-17; Government's Exs. 9 and 10)

8. Officer Thompson testified that he spent at most two to three minutes in the residence. (Tr. at 17) He did not discover any people inside the residence. (Tr. at 17-18) Officer Thompson did not open any containers inside the residence. (Tr. at 18)

9. Upon exiting the residence, Officer Thompson conferred with Officer Lewis and Sergeant Bullard. (Tr. at 18) Based on what was observed in plain view, the officers determined that they needed to call the Drug Enforcement Unit because it appeared that a meth lab might exist within the house. (Tr. at 18) Detective Bill Sweeney and Sergeant Jim Cox were called out to respond. (Tr. at 18, 28) Detective Sweeney testified that he has been involved in drug investigations for approximately 17 years. (Tr. at 28) The majority of these investigations involved methamphetamine labs. (Tr. at 28)

10. Officer Thompson told Detective Sweeney that when he was conducting his investigation inside the residence looking for any subjects, he saw what he believed to be components affiliated with a meth lab. (Tr. at 18, 29) Given what Officer Thompson described seeing in the residence, Detective Sweeney felt that there might be a meth lab in the house. (Tr. at 31) Detective Sweeney decided to do an investigation inside the house. (Tr. at 31) Detective Sweeney testified that he decided to enter the residence prior to requesting a search warrant because based on his experience, meth labs are very volatile with the chemicals and by-products associated with them. (Tr. at 31) Detective Sweeney wanted to make sure that the residence was not a cooking lab, that is to make sure that hotplates were not on. (Tr. at 31) In other words, for safety reasons, Detective Sweeney wanted to check to make sure the residence was not highly volatile at that time. (Tr. at 31-32) Detective Sweeney testified that it was regular police procedure to explore to make sure a residence is safe when they have information of a possible meth lab. (Tr. at 32)

11. Detective Sweeney and Officer Thompson went back into the house where Thompson pointed out to Sweeney the objects that were in plain view. (Tr. at 18) The officers spent approximately two minutes inside the residence doing the walk-through. (Tr. at 35) The officers did not conduct any further search of the residence at that time. (Tr. at 19)

12. Detective Sweeney testified that several days earlier, on May 25, 2004, he was with Detective Nightingale, who is assigned to the Metro Meth Drug Task Force. (Tr. at 29) Detective Nightingale advised Detective Sweeney that he received information of a possible meth lab at 11014 East 23rd Street. (Tr. at 40) Mr. Zelk had been arrested the day before, on May 24. (Tr. at 41) Detectives Nightingale and Sweeney conducted a residence check at the address. (Tr. at 29) Detective Sweeney explained that Detective Nightingale attempted to get a response at the door, but no one answered. (Tr. at 30) The detectives were going to ask for permission to look around. (Tr. at 40) The detectives talked to some people outside the residence, but they did not gain entry into the residence or make contact inside the residence. (Tr. at 30) Detective Sweeney observed an open window in the breezeway. (Tr. at 42) The officers did not attempt to obtain a search warrant that day. (Tr. at 41)

13. Based on what he had seen in the residence on May 28, 2004, Detective Sweeney wanted to get a search warrant so that he could search further in the house. (Tr. at 34) Officers secured the house while Detective Sweeney left to obtain a warrant. (Tr. at 35) Detective Sweeney was back at the house with the search warrant in approximately an hour and a half. (Tr. at 35)

15. The following items were recovered pursuant to the search warrant:

> On the dining room table, next to the open window, an empty 2000 ml. Pyrex flask was found. Next to this flask was another 2000 ml. Pyrex flask which was full of a clear liquid. A PH test was conducted and the liquid was determined to be acid. On the floor a 12" oscillating electric fan was found.
>
> In the northeast bedroom inside a plastic trash can, two empty plastic bottles and two spatulas were found. On the bed an eighteen ounce plastic bottle half full of Red Devil lye and a one gallon empty glass jar and a wire wisk were located.

4

> On top of a dresser drawer of the same bedroom a coffee filter containing a white powdery substance was found. This item was collected and identified as item #1.
>
> Inside the open cardboard box, which was in the bedroom, the following were located: coffee filters, (3) plastic funnels, (2) one quart plastic pitcher, 100 gram calibration weight, (3) wire wisks, large magnetic stir bar, rubber glove, plastic cup, metal strainer, quart glass jar with coffee filters, blender pitcher, one empty glass jar, two quart glass baking dish, three quart glass baking dish, hot glue gun, plastic tubing, (5) plastic lids, (4) razor blades.
>
> A one gallon can of paint thinner was located on the floor near the south wall of the bedroom.
>
> In the south bedroom, on a table next to the computer, a glass eye dropper with liquid, later determined to contain acid, was found. A plastic tube with a white powdery substance was located in the same area and was collected and identified as item #2. Cash receipts were located in the bedroom (items #3 and #4).
>
> In the living room (4) syringes, a Clorox gallon container nearly full of syringes, and a syringe with a liquid (collected as item #5) was found.
>
> Under the kitchen sink a one gallon can of acetone and a plastic spray bottle were located. In the sink a plastic bottle of Kingsford charcoal lighter, plastic funnels, an empty pink jar and an empty plastic bottle were observed.
>
> Outside the residence, in several trash cans numerous items affiliated with the manufacturing of methamphetamine were found. These items included: (3) 32 ounce plastic bottles of empty charcoal lighter, stained coffee filters, (2) Heet bottles, homemade filter, empty 10 count syringe bag, broken glass smoking pipe, rubber tubing, and (4) empty blister packs of 24 count, 60 mg., of pseudoephedrine cold pills. The empty blister packs were identified as item #6.
>
> Throughout the residence I observed numerous items of mail in the name of Kristy Hays, with an address in Gardner, Kansas.

    (Government's Ex. 11)

16. Officer Thompson testified that while he is now aware that three days prior to his entry into the residence, Detective Nightingale had been at the residence and had opened an investigation on the residence, at the time that Thompson entered the residence in response to the burglary call, he was not aware of any investigation regarding the residence. (Tr. at 19) Officer Thompson testified that he was also not aware that defendant Zelk had been arrested by the Independence, Missouri Police Department four days prior to Thompson's entry into the residence, nor that defendant Zelk had been stopped by drug enforcement officers in his car a few days before Thompson's entry into the residence. (Tr. at 25)

17. Defendant Zelk testified that he was renting the house at 11014 East 23rd Street in Independence on May 28, 2004. (Tr. at 46)

5

Case 4:04-cr-00407-DW   Document 207   Filed 08/24/05   Page 5 of 9

III. DISCUSSION

Defendant Zelk seeks suppression of all evidence and testimony related to the entry of the residence at 11014 East 23rd Street on May 28, 2004. In support of his motion, defendant argues:

> The police did not have probable cause to enter the residence at 11014 East 23rd Street on May 28, 2004. They found no evidence of a burglary or other criminal conduct before deciding to enter the residence to conduct a "residence check." The "residence check" was merely a pretext for a search for drug-related evidence, as evidence[d] by the presence of a K9 unit at the scene. The fact that a search warrant later issued to purportedly support the seizure of evidentiary items from the residence cannot cure the initial illegal entry into the residence. The Court should suppress all physical evidence and testimony related to what was observed and seized upon entry into the residence, either prior to or subsequent to the issuance of the search warrant.

(Motion to Suppress Evidence of Search and Seizure at 3)

The Fourth Amendment protects the home from warrantless searches and seizures. See United States v. Dunn, 480 U.S. 294, 300 (1987). However, an exception to this protection occurs when police officers are presented with exigent circumstances. See Payton v. New York, 445 U.S. 573, 590 (1980); United States v. Antwine, 873 F.2d 1144, 1146 (8th Cir. 1989). Exigent circumstances exist "[w]here, in circumstances beyond the officers' control, lives are threatened, a suspect's escape is probable, or evidence is about to be destroyed." See United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 511 U.S. 1077 (1994). See also Antwine, 873 F.2d at 1147 ("legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches").

In the case before this Court, Officer Paul Thompson heard a dispatch come over the airway concerning a possible burglary in progress where the reporting party saw someone exit the back of a residence at 11014 East 23rd Street, carrying a handgun. (See Fact No. 2, supra) The reporting party stated that he thought someone else might be in there too. (Id.) Officer Thompson testified that the caller threatened to get his own gun and go over to the residence. (Id.) Officer Thompson responded to the dispatch. (See Fact No. 3, supra) He testified that the police have a duty to respond to any and all calls, especially one of this nature where there is a possibility that someone is armed. (Id.) Officer Thompson testified that his dog is trained as both a narcotics detector and

6

a patrol dog. (Id.) Thompson will normally respond on any hot call (i.e. a crime in progress, a party is armed or large fights) if he is not busy. (Id.) He considered the dispatch regarding the burglary in progress to be a hot call. (Id.) At the residence, Officer Thompson observed an open door that led into an area described by Thompson as a breezeway. (See Fact No. 4, supra) Thompson went into the breezeway to investigate and saw an open window. (See Fact No. 5, supra) The open window was significant to Officer Thompson because it added credence, based on his experience, that there had possibly been a burglary committed or that possibly someone was still inside the residence. (Id.) Officer Thompson looked through the open window and saw a large Pyrex-type beaker in plain view on the kitchen table. (See Fact No. 6, supra) Thompson testified that he has seen flasks, similar to the one he saw on the kitchen table, used in the manufacturing of methamphetamine. (Id.) While Officer Thompson took note of the flask, his concern at that time was not a meth lab. (Id.) Instead, he was concerned that a victim might be injured inside the residence or that a suspect might still be inside the residence. (Id.)

Next to the open window, was a closed door that led into the house. (See Fact No. 7, supra) Officer Thompson turned the doorknob and discovered that it was not locked. (Id.) He opened the door and announced that they were police officers to see if he could get a response from anyone inside. (Id.) There was no response. (Id.) Officer Thompson then walked through the door into the kitchen area where he also had a view of the living room area. (Id.) Thompson observed syringes and other paraphernalia items on the living room floor in plain view. (Id.) From the living room, Officer Thompson walked through a bedroom that led into a bathroom and then another bedroom. (Id.) In one of the bedrooms, Thompson observed, in plain view, items that are commonly used in manufacturing methamphetamine. (Id.) Officer Thompson testified that he spent at most two to three minutes in the residence. (See Fact No. 8, supra) He did not discover any people inside the residence. (Id.) Officer Thompson did not open any containers inside the residence. (Id.) Based on what was observed in plain view, the officers determined that they needed to call the Drug Enforcement Unit because it appeared that a meth lab might exist within the house.

(See Fact No. 9, supra)

Detective Bill Sweeney was called out to respond. (Id.) Given what Officer Thompson described seeing in the residence, Detective Sweeney felt that there might be a meth lab in the house. (See Fact No. 10, supra) Detective Sweeney testified that he decided to enter the residence prior to requesting a search warrant because based on his experience, meth labs are very volatile with the chemicals and by-products associated with them. (Id.) For safety reasons, Detective Sweeney wanted to check to make sure the residence was not highly volatile at that time. (Id.) Detective Sweeney testified that it was regular police procedure to explore to make sure a residence is safe when they have information of a possible meth lab. (Id.) Detective Sweeney and Officer Thompson went back into the house where Thompson pointed out to Sweeney the objects that were in plain view. (See Fact No. 11, supra) The officers spent approximately two minutes inside the residence doing the walk-through. (Id.) The officers did not conduct any further search of the residence at that time. (Id.)

The Court finds that Officer Thompson was justified in entering the residence without a warrant because he could reasonably have believed that lives were threatened or a suspect's escape was probable based on the phone calls that dispatch had received and Officer Thompson's discovery of the open window. The Court finds the testimony of Officer Thompson credible that he was searching the house for possible victims and/or suspects. The scope of Officer Thompson's warrantless search did not exceed what was necessitated by the exigency. See United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989). Officer Thompson seized nothing. Based on the exigent circumstances present in this case, Officer Thompson was not required to obtain a search warrant before searching the residence for possible victims and/or suspects.

The Court further finds that Detective Sweeney was justified in entering the residence without a warrant because he could reasonably have believed that lives were threatened based on what Officer Thompson described seeing in the residence. The Court finds the testimony of Detective Sweeney credible that he felt that there might be an active meth lab in the house and for

8

safety reasons, he wanted to check to make sure the residence was not highly volatile. Detective Sweeney's safety sweep of the residence was completed in approximately two minutes and did not exceed what was necessitated by the exigency. Based on the exigent circumstances present in this case, Detective Sweeney was not required to obtain a search warrant before searching the residence for an active meth lab. See United States v. Walsh, 299 F.3d 729, 734 (8th Cir.), cert. denied, 537 U.S. 1066 (2002)(officers' actions complied with Fourth Amendment standard of reasonableness where officers conducted limited warrantless search to determine whether there was a risk of fire or explosion from suspected meth lab and then obtained warrant before investigating lab more thoroughly).

In this case, there was no warrantless seizure. Instead, there was plain view observation of items involved in the manufacture of methamphetamine which led to the issuance of a search warrant. There was no constitutional violation.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Charles Zelk's Motion to Suppress Evidence of Search and Seizure (doc # 126).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                         */s/ Sarah W. Hays*
                                         SARAH W. HAYS
                                 UNITED STATES MAGISTRATE JUDGE

9

Case 4:04-cr-00407-DW   Document 207   Filed 08/24/05   Page 9 of 9